The next case is Pero Family Farm Food Company v. Lloyds of London. John Crabtree is here for appellate Pero, and David Frederick is here for Lloyds of London. And Mr. Crabtree, you may begin with your argument. May it please the court, I'm John Crabtree for Pero Family Farm. This is a coverage case. It all really comes down to the coverage clause. And the coverage clause is pretty clear. It covers all goods and merchandise of every sort incidental to the business of Pero Family Farm. Counsel, I appreciate you starting right there, because I read in your brief exactly what you just said there, which is this is our coverage clause. And I think if that were the coverage one. But normally in a coverage clause, there is language which says, we cover all risk, we cover all this, we cover such and such. In other words, the word coverage or cover is in there. In the paragraph you've just quoted, and this is on page two of Docket Entry 56-23, it's the first page of the agreement in the subject matter insured. Can you point me where it says we cover or this is covered? It does not say that there. I certainly own that, Your Honor. Okay, so where does it? And I agree with you. I've read it backwards and forwards, as I know you have. It's not there. Where is that language in the agreement? Because it does appear somewhere to me. And Your Honor, may I ask what you're referring to exactly? Okay, so I thank you. Then let's fast forward. So if we go to page three, a voyage clause. Right. Because there it has the magic word. There it says, within the geographical limits of this policy, comma, cover here under shall attach from the time of the assured, assumes an interest in and or responsibility for the subject matter insured, subject matter insured being what you just referred to, and continues uninterrupted, including transit, stock and location, until that interest and or responsibility ceases. And then it says it's covered, including in these other places also. So you would agree with me, that is the coverage clause, right? Actually, Your Honor, let me just say that I think everyone treated the other provision as the coverage clause up to this moment. But let me take it from there. Well, take your premise. So let's say that's the cover. That's not my question to you. My question isn't a premise. My question is, isn't that the coverage clause since that's the one that says cover? Your Honor, we actually believe the other provision is the coverage clause because it describes the items that are covered. And But defining the items at issue, the subject matter at issue can't really be the coverage clause because it never says we cover the items at issue. In other words, you need the magic words, don't you? I don't think you need the magic words. I think the contract has to be read as a whole, which is what one thing both sides agree on. And I think read as a whole, that is the coverage clause. But let's just take the other clauses, the coverage clause to move on, because I think that still helps us. Because if you read that in conjunction with what we've always called the coverage clause, the items covered, and you treat that other clause as non-illusory, which you have to, then you read it from, you read that continuous coverage clause and it says from the time that Pero gains ownership and possession of the property until we see. It says assumes an interest or responsibility. Assumes an interest, right? And don't you have an interest? I mean, start with just some points here. The insurance company Lloyd's covered the actual crops that had already been harvested and were in refrigeration, right? Of course. Yes, your honor. What we're just arguing about here are the plants that were still in the ground, right? And the plastic coverings that were protecting, trying to protect it from the hurricane. Correct. And then the I think that's correct, your honor. Okay. So that's really what we're arguing about in terms of the coverage. That's the frame. Yes, your honor. Okay. So the problem for, so, so jumping, jumping into that there, Mr. Crabtree. So you're right. And you've, you've absolutely covered that it assumes an interest and a responsibility at the time that the assured, uh, it shall attach when it, when the assured assumes responsibility, but you missed there that, that prosecutory clause. And I think that to me is, is really critical here because that prefiguratory clause says within the geographical limits of this policy, such and such, such and such. So what are the geographical limits of this policy? Because the policy actually defines geographical limits, right? It does. And those are the points from a place to a place, right? No, it definitely would cover a transitory period. There is no doubt, but it also says places and includes while even being at a contractor and that's a pre-transit moment. There's no doubt about it, but it's from the place to the place, not at the place it's from the place to a place, right? Well, it says from place to place, but I don't think that's exclusionary to being at the place because the, again, the contractors are at a place as well. Doesn't it also say including while at rest and or in store and, and, or while at contractors? It does. Right. So from a place to a place, including while they're being stored and including while they're at any contractor from a place to a place, right? Well, no, I mean, no, the contractor would be before we necessarily get it. If someone's growing plants for us, for example, so that a contractor could be, and it doesn't have to be in them. It's not how is there any way to read geographical limit when the limit is from a place to a place and, and that from a place to a place includes while it's at rest, meaning it doesn't have to be moving at every time it could be at rest. It could be in storage as exactly what judge Legault asked you. What was covered was that which was in storage at the time in transit. And while it's at a contractor, in other words, the, the, the insured doesn't own all the warehouses that they store its goods at. They, they store it at, at third-party places in between when it gets from a place to a place, right? Your Honor, how do you reconcile that? How can, how can one reconcile that one can't with the coverings and the seeds because the coverings and the seeds are, are going to be fixed on. But subject matter doesn't says plastic coverings, aren't the vegetables when they're packaged in plastic coverings before they get to the that wrapping is plastic, right? Your Honor. Yes. And see, aren't there seeds inside beans and inside peppers? Yes, but no one, no one wants those. You're on this. I think, I think the reasonable construction, that language and the seeds of the seeds that are, let me ask you this, the seedlings that are in the contractor. So as I understand the seedlings are in the ground in a third-party greenhouse, right? At some point, those are transported to the farm owned by the insurer, right? Sure, Your Honor. Right. So there, at some point, those are in fact transported. Sure. And then Your Honor, you have a problem with the word continuous because in that same provision you're using, it's, it's uninterrupted, I believe. And in that same provision that you're reading, the coverage provision, it says it's from the time that we acquire an interest in it until we cease to. And that would. Right. But, but, but it's, the problem is it's within the geographical limits. In other words, it's limited in, you're completely correct. When you assume responsibility or interest to when you drop it off to the grocery store or to whatever the retailer that's going to sell it. But let's just take the scenario you just said, Your Honor. Let's say, let's say we're, we're, let's say that covers ABC contractors growing some seedlings for us. We're, they're being transported to us. We're then growing them and then we're selling them. Okay. But that coverage by the provision that you're calling now, the coverage clause is uninterrupted. You can't get around, you can't get around that language. The coverage never ceases. From the time it's from a place to a place, the coverage never ceases. You're saying that the, that the continuous clause. I'm not saying anything. I'm merely asking you. And Your Honor, we would say no to that. The reason we would say now is that, that the geographic limits show that the boundaries of it. We are in North America at all times. We're never outside of. I wanted to ask about that because the, the, the voyage geographical limit definition isn't just ports. It says, and, or places. I mean, places, that's very broad. It's very broad, Your Honor. That's anywhere, right? Correct. Correct. And it's in North America. Right. We're definitely in North America. There's no dispute about that. And to the extent there's any, any ambiguity, we would say it's got to be construed in favor of coverage. That's the one. Again, we're here under Florida law. Correct. We're not at the third DCA, but we're, we're under Florida law. Right. Almost like a third DCA today. Almost like. Two thirds away there. Counsel though, you're absolutely correct that we have to read this whole thing together. And so in trying to read it together, there are some other provisions that, that we could look at. For example, when you, when we talk about having to report some, some problem, in other words, when, when coverage attaches or when you believe it attaches and you have to report, there's some very detailed instructions about what the insured has to do. Correct. Well, Your Honor, those constructions of actually read all the way through would never apply in all, all the way through in any instance, even in a cargo environment. I do want to say something to be clear. Can we, can we look at those before we go off of that? So if we look at, and I'm looking at page 17 and page 18 of the contract that we've been talking about. So it says in the event of circumstances may result in a claim, the following procedure should be followed. And it tells you who to contact and it gives you phone numbers. And it says the following information should be included in any first advice notification, along with the documentation, the name of the vessel or conveyance, which is the transportation mode, the date of the shipment, meaning when it was from somewhere, the voyage, meaning, you know, what, what the voyage was, the insured cargo, meaning what was actually lost there is in there. And then it also says that as soon as possible, we need you to give us an ocean bill of lading, an air bill or another contract of carriage, a copy of the commercial sales purchase invoice, the packaging list that, that, so it's packaged material, the copy of the discharge tally or meaning what was what was actually left the warehouse copy of a delivery receipt. And then it says it must include the packaging materials must be retained until underwriters have been there because they actually want to see what those packaging materials that we referred to are. Doesn't that indicate shipment? Oh, your honor, it definitely relates to shipment, but let me say this two things, please. One, that's not an exclusionary clause. Two, it cannot be used to defeat coverage where coverage is otherwise provided under Florida law. It's non-exclusionary clause, and it cannot be used. Also, I think that comes under the general provisions, which expressly state that where there's a conflict between the coverage provisions and the, and the general provisions that the coverage provisions trump, which is not a surprise. Can we look to the, can we look to the, the monetary limits? So the, the policy limits, and that's on page two and then referencing page 11. So on page two, the monetary limit is $150K if it's a domestic inland conveyance, meaning some sort of transportation device, and then it's $5 million for any one location. So while it's at a location, but location is not defined as farm or greenhouse or anywhere like that. It's defined as a building, a tank, a dock, a wharf, a pier, and a bulkhead. Now, if we're to, if we're to use our, our rules of statutory interpretation, where we use, look at the general and the specific, those all seem to be referring to places of transport or, or rest in the middle of transport. I believe on page three, line four of our initial brief, you'll find a record citation to where they admit that this was at a location covered under the contract. Your honor, I see I'm, I'm, I'm out of time. I would like to reserve the rest of my time for a bottle unless the court has a question wants me to answer right now. Can you finish? Did you, did you finish answering judge Lux question? I think so, your honor. I think so, your honor, that, that, and again, I would reiterate the fact that that is not an exclusionary provision. And if there is a conflict between it and coverage, coverage wins. It's simple as that. And by the way, I really want to make clear about this one point. We do not dispute that this is a contract that largely covers cargo. In fact, to use the blacks language definition that the judge used, it may be even especially about merchandise, but the word especially inherently does not mean necessarily, and inherently means there's other stuff. And so our point is that given the principles under Florida law about coverage, the coverage language controls here. And if there is an inconsistency, then it resolves in our favor. Thank you. You mentioned blacks law dictionary and it's what the word goods means. Are there any other interpretive tools? I mean, going back and forth and arguing about what the language of this contract actually means, what other interpretive tools would we use to interpret the terms of this contract? Well, your honor, I would use the rule in Florida law as a rule of first construction that regardless of ambiguity, that it's construed in favor of coverage. I would use the, the language that surrounds the word goods as well, which is extremely broad and inclusive. Okay. Which says all, all goods of any sort incidental or in connection with our business, and then gives examples of seeds and coverings, which are items that are not transport items. And then I would look at goods as well. And I'd look at both the first and the second definition under, under blacks. And again, I would say that even, even the definition that, which just was less than ideal, but the district court chose to use itself inherently means that not all goods are merchandise because the word especially would be meaningless in blacks otherwise. Because there's covers both merchandise and goods. Absolutely. Each has to have a discrete meaning. And can, and actually I'm going to ask this to counsel for Lloyd's as well. So he might as well hear it as well, but under the, the commercial code, the UCC, and also the Florida statute that talks about goods, there's commentary that talks about how crops who are being grown are considered goods. That, that is correct. Under the Florida statute that adopts the UCC, it says that as well. I think it's 0.105 or something. Growing crops are included within the definition of goods since they are frequently intended for sale. That would mean that the plants that were in the ground prior to the hurricane would have been considered goods. That is correct, Your Honor. And therefore covered. Yes, Your Honor. That's really, really for Lloyd. So he's prepared. Okay. I'm sure Mr. Bretter will appreciate that. Okay. Thank you. Thank you, Mr. Crabtree. And we'll hear from Mr. Frederick. And Mr. Frederick. Sure. I'll start with Judge Lagoa's question. They don't, they don't sell plants in the ground. They're not a nursery. They don't sell things that they grow in pots. They sell produce. Produce is the product of a plant in the ground. Produce is what their product is covered by plastic coverings, shipped in trucks, and other means of conveyance. This is a marine cargo insurance policy. It is not a crop insurance policy. There are very distinct differences, which is why, Judge Luck, I appreciated that you touched on maybe six or seven of the textual provisions that indicate why coverage of plants in the ground is not encompassed within all of the different terms. I have to tell you, though, counsel, I'm with Judge Lagoa in that, and your opposing counsel, that goods and merchandise here probably does include seeds and plants. I just, I'm having trouble getting to there. And I know that's part of the basis that the district court ruled on. But it seems to me that that's almost besides the point. Because even if those things are goods and merchandise, the question is, when are those goods and merchandise actually covered? And that leads us to other provisions dealing with what actually is the coverage provision here. And that gets me to where the question that I asked Mr. Crabtree, which is, isn't, while seeds may be covered and packaging may be covered in all its forms, and plants may be covered in all their forms, as broadly defined in the goods and merchandise section. And as Mr. Crabtree, I think, well points out, the real question is, when are they, what is the location of the coverage? So if you can address that for me, that would be very helpful. Sure. I think that the best way to understand it, in light of how you pointed to the duration of a voyage, the question of whether plants in the ground are on a voyage would be the first question that you would ask. And clearly they're not. Under the other side's theory, the voyage begins upon receipt of seeds, and then the voyage stops for six months while these plants are growing in the ground. That's an absurd interpretation. There's nothing in the stat, in the provision of the contract to suggest that whilst at rest means they're actually growing. And the point of the provision for marine cargo is to take produce once it has been picked in the field to be transited to market. So Council, part of your opposing Council's response to that point is, if that's the case, if it only applies to grown produce that's being delivered, then why, A, that seems to be contrary to the convention and merchandise, and B, why did it specifically refer to plastic packaging or plastic coverings and seeds, which are two things that are in the business here. So explain to me how those things fit into being transported or part of the transportation, a part of the coverage here. Sure. These are products that are transported in plastic. You noted in your question of my friend on the other side that these are basically plastic bagged salads that are sold. And so when they are packaged in the packing house, they are put into plastic and they are put into means of conveyance to carry this as plastic coverings. The seeds were specifically added as an item because Pero wanted to ensure that when the seeds are transported to its farms that they would be covered because of the value of the seeds. So it is perfectly plausible to understand why the parties would have covered the transiting of seeds, because that is fundamental to Pero's farming business. So in other words, these seeds are valuable and when you're transporting them from the contractor where I guess they're growing into like little seedlings and then ultimately planted on their farm, which is some miles down the road, if something happened to the truck carrying those, they want to make sure those seedlings are covered because they're very valuable. That's correct. But then if you go back to the valuation provisions that I think you were starting to look at, Judge Luck, in the opening argument, what the other side wants to is to take the full product of a seed and say that every single seed might be valued at the produce value of five full peppers, for instance. And that is not how the valuation provisions are intended to work. If you look at the statement of values, which is the very last provision of contract, it puts in values for locations that are fixed structures. The words crops, plants, seedlings, fields, acreage, farms, greenhouses, growing houses, those words do not appear in this contract. Can I ask you a question, Mr. Frederick? What does it mean in the duration of voyage clause? I see there's including transit coverage, location coverage. What is stock coverage mean? Stock coverage are those items that are like boxes that would be included for if you were packaging materials that would go into boxes to do this in bulk. That is the typical way that these insurance provisions. That's what that definition of stock would mean Okay, correct. Yes. Yes. And so I think that the, you know, the key thing here to understand is that if you read all of these different provisions in light of the application, where the application was encompassed within the contract under Florida law, what they applied for was a marine cargo insurance policy. That's what they had in 2015 and 2016. They came to the conclusion that their own crop insurance was too expensive. So what they're fundamentally trying to do here is to convert a marine cargo insurance policy into a crop insurance policy that is allowed to lapse. I guess where I'm having difficulty is in the language where it talks about the duration of voyage coverage where it says that the assured assumes an interest in and or responsibility for the subject matter insured. And the subject matter insured also includes seeds and or farm produce and or packing and or plastic covering. I mean, those things were the, let's say for example, the crops that were in the ground, those were clearly, they had assumed an interest or responsibility for that because that was on their location, was it not? No, it was not on their location. Judge Luck is absolutely right that the definition of location is a building, it's a wharf, it's a dock, it is a physical structure. The farm does not meet any part of the definition of a location. And that's why Judge Lagoa, I think it's important to understand that all these provisions have to work together. You don't just take one provision of this contract, attempt to parse it and say it is divorced from all the other terms, including the word conveyance, which is a word of movement. I want to go back to your point about the application. I have to say, I tend to agree with your opposing counsel here on how broadly you're defining the word application here. I understand the concept that the application is relevant as part of what you're deeming to be application includes a lot of things like email exchanges and things like that, which seems to bleed over into extrinsic evidence, which I think everyone agrees this is an unambiguous policy and shouldn't be considered. So I'm having a little trouble there. But I will say, on the other hand, the policy does seem to reference the sort of the general tenor on page five in the information notes that come there, where it says that transit from field to packinghouse, USD dollar amount, $24 million. That seems to be sort of the reflection in the policy itself of what the intent was from the application. Is that fair? That is fair, Judge Luck. And if you look, and I appreciate that the line between extrinsic evidence, which we think is appropriate for affirming on an alternate ground and the actual application, may be a little bit of a fine one. But if I could just direct you to the landmark global risks cargo stock throughput questionnaire, which is in the record. And it- I have 56-5. Okay. What is it, 56-5? The type of goods to be insured is produce, primarily peppers and beans. It doesn't say bean plants. It doesn't say pepper plants. It says produce. Produce is what you get out of a grown plant that bears fruit and vegetables. Counsel, I just- that may very well be the broad that it seems to cover more than produce. I just- go ahead. But the goods and merchandise has to be something sold under Florida statutory law. Both terms are goods that are sold. They do not sell plants in the ground. They sell produce of those plants. And the other part, the next part of the application that I was just referring to- If that were the case, then you wouldn't use the word incidental to the business. I mean, that it's something that is necessary for the business, but it's not the business. That's why the words about the plastic coverings being incidental to the business are the way that it is packaged. If they had sold it at a farmer's market, they wouldn't use the plastic covering. The fact that they- Incidental could also be the seeds. I mean, that's not a winning argument for you. I think- Well, no, I think that- You should go to something else. Well, the other part of the application that I want to refer to is that they are assigning an annual value of these green beans and peppers on vehicles. On vehicles. That's a word of transit. A vehicle is not used to grow these produce items. Mr. Frederick, you mentioned a few minutes ago with regard to the application documents that a policy that would cover the crops might have been too expensive for payroll farms. Is there any indication of that in the record, that the price of the policy, the premiums, if the premium here is based on what actually was covered? Yes, there are- Is there any indication in the record of that? Yes, and we've cited that in a brief. I is that Paro chose to allow it to lapse because it thought that the premium for 2017 was higher than it wanted to pay. Notably, when they sought to interpret this particular contract as including crop insurance, and they sought to do this in 2018, the premium didn't go up at all after Lloyd said, we're not authorized to sell you crop insurance, and we're not part of the federal program of authorized crop insurance purveyors. Was there an option for coverage that would include crops for a higher premium? Yes. Okay. All right. That's in the record? Yes. Yes. We've cited the briefs in our part of the application section, and if you look at the Land O'More declaration and the Balchon declaration, they talk about how Balchon came to Land O'More to ask for crop insurance coverage and was denied that because the Lloyd's underwriters are not registered under the federal program. There are 14 or 15 authorized insurers of crop insurance, and the Lloyd's underwriters are not one of them. The fundamental argument that they're making is that inadvertently, the Lloyd's underwriters created a crop insurance out of a marine cargo insurance, and by using words that are, I think, taken very broadly out of context to provide for millions of dollars of crop insurance coverage for a $15,500 premium that is intended to cover the transiting of their produce from the field to their markets. I'm going to ask one more question. We're going back and forth on interpretation of the terms of this insurance contract. Why aren't we bound by Florida law, which says that in circumstances like this, we construe coverage in favor of the insured? Why shouldn't we apply that Florida law? Because the Florida canon of construction that applies here is not coverage regardless of how the terms are to be interpreted. There are 10 terms of the provision of this that make very clear that cargo insurance is not crop insurance, but the canon of construction, Judge Wilson, that applies is that you would construe coverage and ambiguity against the drafter. Here, the evidence was that it was Pero's agent who drafted the provisions because those are additive add-ons to what was a form contract. I think that, Judge Wilson, you wouldn't ordinarily take a marine cargo insurance policy, which has been in existence for literally hundreds of years, and transform it into a federal program that was created in the 1930s to provide crop insurance under very specified regulations that require, in the application and in the policy, to set out acreage, what types of crops are being covered, what the value of that acreage is. None of those provisions exist in this marine cargo insurance policy. May I ask a question regarding location? So I understand, based on the definition of location, that the farmland, the crops on the farmland may not be covered, but let's talk about the seedlings because under location, it still says any building. So is a greenhouse a building? I don't think so. A greenhouse is a plastic structure that is intended to capture warmth. I wouldn't define it as a building. I think it is also read in context. It's not a tank, a dock, a wharf, a bulkhead. Those are all words which, if you apply normal canons of construction, you would say that the words around it are intended to provide their meaning, and a building would be like a warehouse, not a greenhouse. A greenhouse, they could have used the word greenhouse in this contract, and they did not do that. But I just want to confirm, in the record, does it give us information as to where exactly the seedlings were located? The seedlings were located on the farm. We're talking about immature plants that they coverage for. I thought the seedlings were held by a contractor. There are some seedlings that were held by a contractor. The record, I don't think, specifies this particular greenhouse where they were located. That was part of the extrinsic evidence. I mean, I'm saying it's a greenhouse, but is there evidence in the record that it was a greenhouse? I don't know. I don't know. All right. Thank you, Mr. Frederick. Thank you. Mr. Crabtree, you have reserved some time for rebuttal. Thank you, Your Honor. A few quick points. One, Judge Wilson, you raised the issue about the canon of construction in favor of coverage. Under Florida law, that does not require ambiguity, and if there is an inconsistency in the contract, apart from ambiguity itself, also the contract would be construed in favor of coverage. I also want to hone down on- Is it the Bureau or is it the Lawyers of London? Well, as we point out in our reply brief, that's a disputed issue of fact, but again, we don't think we need to even get to that secondary issue because as a rule of first construction, Florida construes even unambiguous contracts against or in favor of coverage, so we don't even have to get to the secondary rule about where there is ambiguity and you construe against the draft, but as we point out in our reply brief, the issue of who ultimately drafted it is disputed by the parties at this point, and that wasn't something that the trial court resolved, but I'd also like to point out that this coverage clause, the clause that Judge Locke has called the coverage clause, says that the coverage begins from the time we take ownership and is continuous until we cease to own it, so whether it's we get it from somebody, we transport it, it comes to us, if it's still in North America, it does not stop until we cease to have ownership of it. But the part that you left off, and we discussed this the last time you were up, is that first clause, because the first clause limits everything that comes after it, so without that first clause, you'd be right, it'd be the point at which you take interest until the point which you lose interest, which you sell it to a retailer or whoever or a customer, but the first clause limits it to the geographical limits defined in the policy. But we don't think that those geographical limits in any way impede that analysis. We would suggest the geographical limits include when we acquire it in North America until we sell it. But it doesn't say that, it doesn't say at a place or at our farm, it says from a place to a place. In other words, the limits are when it's from something to something, and it includes when it's in stock or at rest, or when it's at a building in between places, at a location in between places. Well, I believe, again, on page three, line four of our initial brief, we cite something to the record about a concession about location. But I'd like to hit a few other topics quickly. One is, everyone who's ever looked at a farm knows what the coverings are here. They aren't something, a piece of worthless plastic you drop over something that's being shipped. The coverings in a farm, we all have seen them. You know exactly what they are, and that's what we've alleged below, and that's what they are. Those things are never sold, right? And when you worry about, when concerns about, let's say, the valuation method in this case, and if you tether it only to the concept of the sales price, how would that make sense to exclude coverage when it would never then cover the coverings of the plants, or for that matter, really, let's say the seeds that are in the ground except at their retail price? And our expert, if we're going as far into parole as Lloyd's wants to do, our expert testified that this is a normal way of doing valuation for growing plants. This is predominantly about shipping, but it is also covering plants growing, and that's how the court shook and chewed. This federal program is not required, and if Lloyd's made a mistake, under Florida law, equitable estoppel would have stopped Lloyd's from disavowing coverage. Lloyd's had 400 years to get this contract right. It should be clearer, and it shouldn't be construed against us. On that basis and everything else, we'd ask the court to please reverse the judgment. All right. Thank you, Mr. Crabtree, and Mr. Frederick, we appreciate your arguments. Thank you.